**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

BENJAMIN TOPP,
as Administrator of the Estate of Jason Stephens,

Plaintiff,

v.

ILLINOIS DEPARTMENT OF CORRECTIONS, WEXFORD HEALTH SOURCES, INC., STEVEN BOWMAN, MELVIN HINTON, CATHERINE LARRY, GARY BENSON, RYAN WOODS, DEVON BRODIE, BRIANNA DIXON, REYMUND ERVY, SUNSHINE GILLS, BREONDA HARVELL, TIMOTHY HINES, ABAYOMI OBADEIN, BRIANNA SUMERLIN, MIGUEL VELAZQUEZ, SOPHIA WILLIAMS, NATHANIEL OLIVER, MONTISIA CLARK, ASONTA DODD, JUSTIN HAMMERS, ARTHUR FUNK, MARLENE HENZE, ALEXANDER ANOOSHAH, DIANNA KUCERA, ANDREW GAMA, J.G. MARTIN, GRETA TARASEVICIUTE, JENNIFER OBAZEE, AYODEJI ADEYEMI, and ALEX ONOMAH-GAISIE,

Defendants.

Case No. 26-cv-06727

Hon. Jeremy C. Daniel

**AMENDED COMPLAINT**

Plaintiff Benjamin Topp, as Administrator of the Estate of Jason Stephens, by and through his undersigned attorneys at Kaplan & Grady LLC, complains of Defendants Illinois Department of Corrections, Wexford Health Sources, Inc., Steven Bowman, Melvin Hinton, Catherine Larry, Gary Benson, Ryan Woods, Devon Brodie, Brianna Dixon, Reymund Ervy, Sunshine Gills, Breonda Harvell, Timothy Hines, Abayomi Obadein, Brianna Sumerlin, Miguel Velazquez,

Sophia Williams, Nathaniel Oliver, Montisia Clark, Asonta Dodd, Justin Hammers, Arthur Funk, Marlene Henze, Alexander Anooshah, Dianna Kucera, Andrew Gama, J.G. Martin, Greta Taraseviciute, Jennifer Obazee, Ayodeji Adeyemi, and Alex Onomah-Gaisie, and states as follows:

## INTRODUCTION

1. Jason Stephens was incarcerated at Joliet Treatment Center on July 27, 2024, when his mattress caught fire. What followed was an appalling display of disregard for Jason's life.

2. First, Defendants allowed the fire to rage uncontrollably in Jason's cell. Although surrounded by equipment that could have extinguished the blaze and expelled the smoke, Defendants idled apathetically for several minutes while another prisoner in the unit screamed for help. When Defendants finally went to Jason's cell and extinguished the fire, Jason had been incapacitated by the smoke.

3. Then, instead of removing Jason from his cell or providing him with desperately needed medical treatment, Defendant Hines sprayed Jason with an inflammatory chemical agent—a highly concentrated type of pepper spray—further injuring him and causing additional respiratory distress.

4. Defendants' astonishing indifference to Jason's health and safety did not end there. Correctional and medical staff left Jason in his cell for more than 20 minutes without attempting to render medical care. When firefighters and paramedics arrived on the scene, no one even bothered to inform them that Jason was lying unresponsive on the floor of his cell. Ten minutes passed as the firefighters set up smoke ejectors because they were unaware of Jason's dire needs.

5. When the firefighters eventually learned of Jason's distress, they rushed to retrieve Jason and get him into an ambulance for transport to the nearby hospital. Defendants impeded the

ambulance's departure through the prison gates for almost half an hour while paramedics pleaded to open the prison gate as they fought to keep Jason alive.

6. By the time Jason arrived at the hospital, it was too late. He died from complications of smoke inhalation two weeks later on August 10, 2024. He was 38 years old.

7. Jason's death was the culmination of brutal mistreatment that he endured while in the custody of the Illinois Department of Corrections. Before the fire, Jason's medical and mental health providers knew of Jason's serious mental illnesses and his pattern of self-harm to receive hospital treatment for his sickle cell anemia, which caused him agonizing pain. Nevertheless, they took no meaningful action to provide him with the medical and mental health treatment he needed.

8. Additionally, multiple Illinois Department of Corrections employees responsible for implementing fire safety measures were aware of the problem of fires at the prison and the facility's deficient practices and equipment, but they did not act to address the risks that threatened Jason and others at the facility.

9. Jason's death was entirely preventable. This action seeks to hold Defendants accountable for their egregious and unconstitutional misconduct that caused his death.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because this is an action arising under the Constitution and laws of the United States and because Plaintiff's state law claims are part of the same case or controversy as the federal claims over which the Court has original jurisdiction.

11. Venue is proper pursuant to 28 U.S.C. § 1391(b) because on information and belief one or more Defendants reside in this District and because a substantial portion of the events giving rise to the claims asserted occurred in this District.

## PARTIES

**A. Plaintiff**

12. Plaintiff Benjamin Topp is the duly appointed Administrator of the Estate of Jason Stephens, opened in the Probate Division of Will County, Illinois.

**B. IDOC Defendants**

13. Defendant Illinois Department of Corrections (IDOC) is an entity of the State of Illinois. IDOC operates all Illinois prisons, including Joliet Treatment Center (JTC), and contracts with Defendant Wexford Health Sources, Inc., to provide medical and mental health care for all people in its custody. IDOC had custody of Jason Stephens at all relevant times until his death on August 10, 2024.

14. Defendant Steven Bowman was at all relevant times the IDOC Agency Medical Director and an employee of IDOC. Defendant Bowman was responsible for implementing, overseeing, and supervising policies and practices relating to the provision of medical care at JTC and all IDOC prisons. Defendant Bowman was acting under color of law and within the scope of his employment with IDOC. He is sued in his individual capacity.

15. Defendant Melvin Hinton was at all relevant times the IDOC Statewide Mental Health Supervisor and an employee of IDOC. Defendant Hinton was responsible for implementing, overseeing, and supervising policies and practices relating to the provision of mental health care at JTC and all IDOC prisons. Defendant Hinton was acting under color of law and within the scope of his employment with IDOC. He is sued in his individual capacity.

16. Defendant Justin Hammers was at all relevant times the IDOC Chief of Operations and an employee of IDOC. Defendant Hammers oversaw operations at JTC and all IDOC adult prisons and had knowledge of and responsibility for fire safety precautions and other security

related policies and procedures at JTC. Defendant Hammers was acting under color of law and within the scope of his employment with IDOC. He is sued in his individual capacity.

17. Defendant Catherine Larry was at all relevant times the warden of JTC and an employee of IDOC. Defendant Larry oversaw the JTC facility and JTC staff and had knowledge of and responsibility for fire safety precautions and all other security related policies and procedures at JTC. Defendant Larry was acting under color of law and within the scope of her employment with IDOC. She is sued in her individual capacity.

18. Defendants Gary Benson and Ryan Woods were at all relevant times the assistant wardens of operations of JTC and employees of IDOC. Defendants Benson and Woods oversaw the JTC facility and JTC staff and had knowledge of and responsibility for fire safety precautions and other security related policies and procedures at JTC. Defendants Benson and Woods were acting under color of law and within the scope of their employment with IDOC. Each is sued in his individual capacity.

19. Defendants Devon Brodie, Brianna Dixon, Reymund Ervy, Sunshine Gills, Breonda Harvell, Timothy Hines, Abayomi Obadein, Brianna Sumerlin, Miguel Velazquez, Sophia Williams, Nathaniel Oliver, Montisia Clark, and Asonta Dodd were at all relevant times Correctional Treatment Officers (CTOs) or CTO Supervisors at JTC and were employees of IDOC. Defendants Brodie, Dixon, Ervy, Gills, Harvell, Hines, Obadein, Sumerlin, Velazquez, Williams, Nathaniel Oliver, Montisia Clark, and Asonta Dodd were acting under color of law and within the scope of their employment with IDOC. Each is sued in his or her individual capacity.

**C. Wexford Defendants**

20. Defendant Wexford Health Sources, Inc. (Wexford), a wholly owned subsidiary of the Bantry Group Corporation, is a for-profit corporation headquartered in Pennsylvania and

transacting business in Illinois. At all relevant times, Wexford was the healthcare provider for all IDOC prisons throughout the State. Wexford was responsible for implementing, overseeing, and supervising policies and practices at all IDOC prisons, including JTC. As an agent of IDOC, Wexford was acting under color of law by and through its lawful agents, including the individual Wexford Defendants.

21. Defendant Arthur Funk was at all relevant times the Regional Medical Director for the Northern Region and an employee of Wexford. Defendant Funk was responsible for implementing, overseeing, and supervising policies and practices relating to the provision of healthcare at IDOC prisons in the northern region, including JTC. Defendant Funk was acting under color of law and within the scope of his employment by Wexford. He is sued in his individual capacity.

22. Defendant Marlene Henze was at all relevant times the JTC Medical Director and an employee of Wexford. Defendant Henze was responsible for providing adequate medical care to patients incarcerated at JTC and for implementing, overseeing, and supervising policies and practices relating to the provision of medical care at JTC. Defendant Henze was acting under color of law and within the scope of her employment by Wexford. She is sued in her individual capacity.

23. Defendant Alexander Anooshah was at all relevant times a nurse practitioner and an employee of Wexford. Defendant Anooshah was responsible for providing adequate medical care to patients incarcerated at JTC. Defendant Anooshah was acting under color of law and within the scope of his employment by Wexford. He is sued in his individual capacity.

24. Defendants Jennifer Obazee, Ayodeji Adeyemi and Onomah-Gaisie were at all relevant times registered nurses working at JTC and employees or contractors of Wexford or

IDOC. Defendants Obazee, Adeyemi, and Alex Onomah-Gaisie were acting under color of law and within the scope of their employment. They are sued in their individual capacities.

25. Defendant Dianna Kucera was at all relevant times the JTC Mental Health Authority and an employee of Wexford. Defendant Kucera was responsible for providing adequate mental health care to patients incarcerated at JTC and for implementing, overseeing, and supervising policies and practices relating to the provision of mental health care at JTC. Defendant Kucera was acting under color of law and within the scope of her employment by Wexford. Defendant Kucera is sued in her individual capacity.

26. Defendant Andrew Gama was at all relevant times the JTC Mental Health Unit Director and an employee of Wexford. Defendant Gama was responsible for providing adequate mental health care to patients incarcerated at JTC and for implementing, overseeing, and supervising policies and practices relating to the provision of mental health care at JTC. Defendant Gama was acting under color of law and within the scope of his employment by Wexford. He is sued in his individual capacity.

27. Defendants J.G. Martin was at all relevant times a psychiatrist and an employee of Wexford. Defendant Martin was responsible for providing adequate mental health care to patients incarcerated at JTC. Defendant Martin was acting under color of law and within the scope of his employment by Wexford. He is sued in individual capacity.

28. Defendants Greta Taraseviciute was at all relevant times a licensed professional counselor and an employee of Wexford. Defendant Taraseviciute was responsible for providing adequate mental health care to patients incarcerated at JTC. Defendants Taraseviciute was acting under color of law and within the scope of her employment by Wexford. She is sued in her individual capacity.

## ALLEGATIONS

### I. Defendants Disregarded a Fire in Jason's Cell and His Urgent Need for Medical Treatment, Causing His Death

29. On July 27, 2024, housed nearly alone on Wing A of Dorm 1 at JTC, Jason set fire to his own mattress in a desperate cry for help to address his medical and mental health needs. Jason was locked in his cell with the burning mattress and no way to escape the flames and fumes.

#### A. Defendants allowed the fire to burn uncontrolled.

30. When the fire started, the only other person celled on Wing A with Jason was an incarcerated man named Bobby Byrd, who was locked in a neighboring cell. Once Bobby noticed the fire, he began yelling "FIRE, FIRE, FIRE," as loud as he could. He banged on his cell door, begging for someone to help Jason.

31. Defendants Brodie, Clark, Dixon, Harvell, Hines, Sumerlin, Velazquez, and Williams (collectively, the "Correctional Defendants") were CTOs working at JTC on July 27. Each was assigned to Jason's wing or the surrounding areas. As such, Defendants Brodie, Clark, Dixon, Harvell, Hines, Sumerlin, Velazquez, and Williams were responsible for monitoring the prison and taking action to ensure Jason's safety.

32. When Bobby yelled for help, several of the Correctional Defendants were congregated in the nearby control room, from which they had a clear view of Wing A. The control room was separated from Wing A by a small day room, which contained tables for prisoners to socialize when released from their cells. Every officer in the control room could hear Bobby's continuing cries for help. Rather than respond quickly to the obvious threat to Jason's safety, however, these Correctional Defendants let precious minutes pass without entering the wing.

33. During this time, the blaze in Jason's cell grew and intensified, and smoke filled the wing:



34. Approximately eight minutes after Jason started the fire in his cell, the Correctional Defendants in the control room finally looked across the day room and saw the thickening smoke.

35. After observing the smoke, Defendant Dixon located a fire extinguisher in the control room and placed it outside the door to the day room. Instead of using the extinguisher, however, she and the other Correctional Defendants in the control room left it sitting on the ground for minutes while the fire continued to burn.

36. Several additional CTOs entered the control room while the fire continued, including Defendant Sumerlin. Both Defendant Sumerlin and Defendant Hines were CTO Supervisors and were responsible for giving orders to CTOs and for making sure that those under their supervision responded appropriately to emergencies.

37. As the fire raged, these Correctional Defendants milled about, slowly putting on plastic gloves and chatting casually with one another:



38. Neither Defendant Hines nor Defendant Sumerlin ordered the CTOs to do anything about the fire. Rather than ensure Jason and Bobby's safety, Defendant Sumerlin left the wing.

39. After these Correctional Defendants became aware of the raging fire, it took approximately four minutes for any of the Correctional Defendants to leave the control room to do anything about it. Eventually, Defendant Dixon grabbed the fire extinguisher and several of the Correctional Defendants ambled onto the wing.

40. Upon information and belief, additional fire protection gear—such as fire-retardant suits—was available, but the Correctional Defendants chose not to use it. A second fire extinguisher hung on the wall, but no one bothered to grab it.

41. Additionally, a large fan sat next to the control room desk for the entire duration of the fire, in clear view of the Correctional Defendants. It was approximately fourteen minutes until Defendant Brodie moved it into the day room, where it continued to sit unused for another seven minutes.

42. By the time some of the Correctional Defendants entered the wing, the fire was no longer blazing, and the unit and Jason's cell was filled with thick smoke:



43. Approximately thirteen minutes after the fire ignited, Defendant Dixon discharged the fire extinguisher through the small food port in the cell door, tamping out any remaining flames.

44. There is no reason why this same simple action could not have been taken many minutes earlier, promptly upon the Correctional Defendants becoming aware of the fire.

**B. Defendant Hines used chemical spray on Jason and Defendants abandoned him in his cell.**

45. It was obvious that, once the fire was finally extinguished, Jason needed emergency medical treatment. Instead of providing medical aid or ensuring that he received it, Defendant Hines instantly ordered Jason to "cuff up." Jason could not follow the instruction—or even verbally respond—because he was incapacitated by the injuries he had suffered from the fire and the Correctional Defendants' delays.

46. Without any justification and only four seconds after the instruction to "cuff up," Defendant Hines sprayed a burst of Oleoresin Capsicum (OC) spray into Jason's cell. OC spray is an inflammatory chemical agent, more concentrated with toxic chemicals than typical pepper spray, designed to incapacitate individuals by causing intense burning, involuntary eye closure, and breathing difficulties. Jason was already incapacitated by smoke and in severe respiratory distress, and the OC spray served no purpose other than to exacerbate his injuries.

47. Several of the Correctional Defendants stood by while Defendant Hines sprayed Jason with the chemical agent. They did nothing to stop Defendant Hines or to help Jason recover from the dangerous and painful spray.

48. After spraying Jason, Defendants Hines and other Correctional Defendants still did not remove Jason from his cell, which was now full of OC spray fumes in addition to the dangerously thick smoke. They did not provide Jason with desperately needed medical attention. Instead, they did nothing for him at all, and simply left the wing.

49. When Correctional Defendants returned to the wing, they continued to ignore Jason's safety and well-being. Instead of helping Jason, who was in obvious danger, several of the Correctional Defendants arranged outside of Bobby's cell to remove him. Bobby pleaded for at least some of them to attend to Jason, but they ignored him and yelled at Bobby to cuff up.

50. Bobby, who was in a wheelchair and having trouble breathing, could not immediately respond to the order to cuff up. So Defendant Hines sprayed him with OC spray, too. The OC spray disoriented Bobby, further slowing the process of getting him out of his cell.

51. Eventually, Bobby felt his way to the door so a Correctional Defendant could handcuff him. Once Bobby was handcuffed, Defendants wheeled him out of the wing.

52. Approximately ten minutes after the fire was extinguished, the large fan was finally turned on. Several minutes later, the smoke cleared. During and even after that time, the Correctional Defendants did not make any effort to remove Jason from his cell or to provide him with medical treatment for the injuries they knew he had suffered from the fire, the smoke, and the OC spray. In fact, Defendant Sumerlin ordered the other Correctional Defendants to leave the wing.



53. At various times while the fire burned and later when Jason lay unresponsive in his cell, Defendants Obazee, Adeyemi, Onomah-Gaisie , and an unidentified member of the healthcare staff (collectively, the "Healthcare Defendants"), stood nearby in the control room and day room.



54. The Healthcare Defendants had medical equipment with them that should have been used to render aid to Jason. Nevertheless, none of the Healthcare Defendants ever even entered the wing. They took no action to medically assess Jason, despite their knowledge that injuries from fire and smoke inhalation are often severe and life-threatening.

55. Defendants Obazee, Adeyemi, Onomah-Gaisie, and the unknown medical staff person entered the day room to attend to Bobby. Bobby yelled that they needed to take care of Jason, who was still in his cell. Despite Bobby's pleas, neither Defendants Obazee, Adeyemi, Onomah-Gaisie, or the unknown medical staff person took any steps to examine Jason or to ask the Correctional Defendants to remove him from the cell.

56. At some point, Defendant Harvell called 911 and requested assistance from the Joliet Fire Department. Defendant Harvell reported that the fire had been extinguished and that there was still smoke in the area.

57. When the operator asked Defendant Harvell whether the individuals immediately around the cell were being evacuated, Defendant Harvell assured him that they were "dealing with the situation." Despite this representation to the 911 operator, neither Defendant Harvell, any other Correctional Defendants, nor the Healthcare Defendants did anything to evacuate Jason from his cell, where smoke and OC spray lingered, or to ensure he received the medical attention he desperately required.

58. The Healthcare Defendants left the vicinity without even bothering to look into Jason's cell to assess his condition, let alone take any action to provide him with desperately needed medical care.

**C. Defendants impeded the actions of firefighters and paramedics as Jason deteriorated.**

59. When firefighters and paramedics from the City of Joliet arrived at JTC at 10:26 pm, neither the Correctional Defendants nor the Healthcare Defendants informed them that Jason was still in his cell. Instead, one or more of the Correctional Defendants told the firefighters that they needed the hallway ventilated.

60. In reliance on the assertion that the Correctional Defendants only needed assistance with smoke removal, the firefighters began to set up smoke ejectors in the hallway.

61. Finally, after the fire department personnel had been in the dorm for approximately 10 minutes, a member of JTC staff casually mentioned that Jason was still in the cell.

62. The firefighters immediately asked the Correctional Defendants to open Jason's cell door and entered Jason's cell. They found Jason on the ground, unresponsive. By that point, he had been lying in his cell for more than 20 minutes after the fire had been extinguished.

63. When the firefighters dragged Jason out of the cell, they noticed his airway was visibly singed, his clothing was charred, and it was increasingly hard for Jason to breathe. Jason was mostly incoherent and could only speak only in one- or two-word sentences.

64. The firefighters rushed Jason to the ambulance in a stretcher. But first they had to wait for Defendant Sumerlin to secure Jason—who could barely breathe—with handcuffs.

65. When the paramedics tried to exit JTC with Jason secured in their ambulance, Defendant Gills, the sallyport officer, refused to open the prison gate.

66. Defendant Gills was the sallyport officer. Upon information and belief, she had the ability and responsibility to open the gate for the ambulance but refused to take any action to allow Jason to get to the hospital quickly.

67. The ambulance driver yelled at Defendant Gills to open the gate. Soon Defendant Obadein arrived at the gate and began confronting the ambulance driver.

68. As Defendant Obadein and the driver continued to shout insults at each other, the paramedics provided the limited care available in the ambulance to try to keep Jason alive. Other fire department personnel joined in insisting that Defendant Gills open the gate so that Jason could be taken to the hospital.

69. As Defendant Obadein and the emergency personnel argued, Defendant Dodd approached the gate, where she was assigned to start the next shift, which was about to begin. Rather than open the gate or request that someone do so, Defendant Dodd joined Defendant Obadein's side in the fight, telling the emergency personnel that the gate could not be opened because JTC staff was just doing their jobs.

70. Defendants Obadein, Dodd, and Gills still refused to open the gate, insisting that they had to wait for escort staff and paperwork before the ambulance could leave.

71. Defendant Ervy was the shift commander during the 3pm to 11pm shift on July 27, 2024, and, upon information and belief, was notified that the ambulance was delayed at the gate. As shift commander, he had the authority and responsibility to order the gate to be opened. yet he took no action to ensure that the ambulance would be allowed to leave on an emergency basis.

72. Every moment that passed reduced Jason's chances of recovery, but Defendants Obadein, Gills, Dodd, and Ervy ignored this obvious fact and refused to ensure that the gate was opened.

73. In the end, it took almost a full half hour before the ambulance was allowed to leave the prison. Jason did not arrive at the hospital until approximately 11:32pm—more than an hour after emergency services arrived at JTC. The hospital was only two miles away.

74. The conduct of Defendants Obadein, Gills, Dodd, Ervy, and the Correctional Defendants was so appalling that the Joliet Fire Department contacted the Joliet Police Department after this incident and officers from both groups returned to the prison to discuss what happened, including the procedures for ambulances to leave for the hospital, with prison supervisors. For Jason, however, these efforts were too late.

75. Jason survived for two weeks after the fire. During that time, he remained in the Loyola Medicine Burn Center, where he suffered the effects of the smoke for two weeks while undergoing numerous therapeutic interventions, including being placed on a respirator.

76. Jason died on August 10, 2024, at Loyola. The Cook County Medical Examiner determined that his cause of death was "complications of inhalational injuries due to mattress fire."

## II. Jason's Death Resulted from Supervisors' Deliberate Indifference to Prisoners' Safety from Fires at JTC

77. Each of the Correctional Defendants, the Healthcare Defendants, and Defendants Obadein, Gills, Dodd, and Ervy contributed to Jason's death through their deliberate indifference to his safety. They each knew Jason was in danger, and they did nothing to reduce that danger by quickly extinguishing the fire, ensuring Jason was removed from his cell, or hastening the exit of the ambulance.

78. However, the deliberate indifference to prisoners' safety at JTC did not begin with the fire on July 27, 2024. To the contrary, Defendants Hammers, Larry, Benson, Woods, and Oliver were all aware of, and took no action to remedy numerous fire safety issues at JTC in the months before the fire in Jason's cell.

79. Fires started by incarcerated individuals at JTC were a shockingly common occurrence. Nevertheless, Defendants Hammers, Larry, Benson, Woods, and Oliver did not take simple measures to improve fire safety, such as purchasing fire-resistant mattresses. Fire-resistant mattresses were requested by Defendant Benson too late, in December 2025. While Jason's housing unit was wired with a fire alarm, it had been inoperable for months.

80. Upon information and belief, Defendants Hammers, Larry, Benson, Woods, and Oliver were aware for months before July 2024 that the fire alarm system was not working.

81. In the absence of a functioning fire alarm, IDOC required that a fire watch officer be appointed for each shift at JTC. Defendant Hammers had advised JTC of this requirement prior to July 27, 2024.

82. Despite the requirement to appoint a fire watch officer, that post was not filled at JTC during the shift on which Jason started the fire.

83. Self Contained Breathing Apparatuses, wearable respirators that allow wearers to enter environments containing smoke or low oxygen, were available at JTC but inoperable.

84. Upon information and belief, correctional staff at JTC found fires to be an annoyance and repeatedly responded to them slowly and inadequately. Nevertheless, Defendants Hammers, Larry, Benson, and Woods—all supervisors responsible for security and operations at JTC—did not ensure that correctional staff were adequately trained, supervised, and disciplined for these actions.

85. In the absence of more effective fire safety measures, Defendants Hammers, Larry, Benson, Woods, and Oliver knew that fires would continue to harm prisoners at JTC and at times would require their quick transport to the hospital.

86. Upon information and belief, Defendants Hammers, Larry, Benson, Woods, and Oliver knew that guards repeatedly delayed ambulances from entering and exiting the prison grounds. Prior to Jason's death, the Joliet Fire Department reached out several times to JTC officials in an effort to fix the problem.

87. Nevertheless, none of the Defendants developed, or advocated for the development of, policies and procedures that would allow the timely transfer of prisoners in need of emergency care to an outside hospital. In the alternative, they failed to train correctional personnel who were

assigned to the sallyport in the proper procedures when a prisoner needed to be transferred to a hospital on an emergency basis.

88. In this culture of indifference, the Correctional Defendants, the Healthcare Defendants, and Defendants Obadein, Gills, Dodd, and Ervy felt emboldened to drag their feet notwithstanding a glowing fire, thick smoke, and Jason's desperate need to get to the hospital.

## III. Prior to the Fire, Wexford and IDOC Medical Staff Failed to Treat Jason's Serious Physical and Mental Health Needs

89. Jason's death was also caused by the deliberate indifference of medical staff to Jason's sickle cell anemia, his mental illnesses, and the widespread practice of inadequate medical and mental health care in JTC and other IDOC facilities.

### A. Deficient policies and widespread practices led Jason to receive inadequate medical and mental health care throughout his incarceration.

90. Jason suffered terribly from sickle cell anemia, which caused acute episodes of excruciating pain. Jason also suffered from serious mental illnesses, including major depressive disorder with psychotic features and post-traumatic stress disorder, which reinforced and exacerbated his pain.

91. As a result, Jason engaged in a pattern of self-harm in an effort to obtain adequate medical treatment. Jason was repeatedly hospitalized for self-harm (at least five times from the start of 2023 until his death). Early in 2024, Jason went on hunger strike for over a month.

92. Medical and mental health staff within IDOC routinely documented the connection between Jason's physical illness and his self-harm. For example, in one medical record a nurse practitioner noted Jason's question: "What do I need to do to get medical treatment or sent to the hospital? Cut myself or swallow a bunch of pills?"

93. There is a widespread practice in IDOC, established by and with the awareness of Defendants Bowman and Hinton, Wexford, and its employees, that medical and mental health

treatment was not meaningfully coordinated as necessary to provide adequate patient care. For example, the medical and mental health records are kept separate in a patient's medical files, and the medical doctors and other medical professionals do not coordinate their care with the mental health professionals treating the same patients. Defendants Bowman and Hinton were aware that this practice caused serious lapses in care, resulting in harm and even death.

94. As a result of this widespread practice, despite the obvious interplay between Jason's physical pain and his deterioration in mental health, neither the medical nor the mental health staff within IDOC prisons made any meaningful attempt to coordinate Jason's care. To the contrary, staff would repeatedly instruct Jason to advocate for himself with the other department without making similar efforts to ensure that such care was being coordinated.

95. Jason's health suffered for years because of these systemic failures, both at JTC and at prior facilities, including Lawrence and Pontiac Correctional Centers.

96. While incarcerated at Pontiac, Jason repeatedly complained about the lack of mental health treatment he was receiving. In response, he was told that until his physical health improved, allowing him to leave the health care unit, he would not receive mental health treatment.

97. While Jason's treatment plans during his time at Pontiac and Lawrence called for both group and one-on-one therapy, he was not seen on a regular basis by any individual therapist, nor did he receive group therapy. Rather, he was allowed to continuously cycle in and out of crisis watch, without anyone addressing his underlying severe mental illness.

98. At Pontiac and Lawrence, Jason was provided only with an outpatient level of care, despite frequently engaging in self-harm, and frequent placement on crisis watches based on findings that he was a danger to himself or others. Eventually, after another hospitalization for self-harm, Jason was transferred to JTC.

**B. Jason was transferred to JTC to address his serious mental illness, but his mental health needs continued to be ignored.**

99. Jason's transfer to JTC on May 17, 2024, was supposed to offer him the higher level of care he desperately needed. Publicly, IDOC has advertised the JTC as a facility dedicated to providing "the most intensive level of care" for incarcerated individuals who have serious mental illness.

100. In reality, placement at JTC was a death sentence for Jason. As a result of Defendants' deliberate indifference, Jason spent the last few months of his life in terrible pain.

101. Defendants Henze, Anooshah, Funk, Gama, Martin, Kucera, and Taraseviciute, all provided healthcare at JTC or supervised healthcare providers at JTC. Each had access to Jason's IDOC medical records and knew of his frequently documented history of severe mental illness, sickle cell disease, and dangerous self-harm in an effort to achieve medical treatment. Despite their knowledge of the high risk that Jason would continue harming himself, they failed utterly to provide him with meaningful medical or mental health care.

102. On May 18, 2024, the day after Jason was transferred to JTC, Defendant Martin conducted a psychiatric diagnostic evaluation. Defendant Martin was on Jason's treatment team and was specifically assigned to be Jason's primary psychiatrist.

103. Jason complained to Defendant Martin of depression, visual hallucinations, flashbacks, intrusive thoughts, feelings of hopelessness, and concerns about his sickle cell disease. Defendant Martin documented Jason's diagnoses of major depressive disorder with psychotic features, post-traumatic stress disorder, and borderline personality disorder.

104. Despite Defendant Martin's knowledge of Jason's history of severe mental illness and his current risk of harm, Defendant Martin did not provide Jason with meaningful mental

health treatment. In fact, he did not even reference Jason's treatment plan in his evaluation, and he did not update Jason's treatment plan as required by IDOC policy.

105. Defendant Taraseviciute was assigned to be Jason's primary mental health professional. As Jason's assigned mental health professional, Defendant Taraseviciute was responsible for developing Jason's mental health treatment plan with input from Defendant Martin. Nevertheless, Defendants Taraseviciute and Martin did not meet to develop a treatment plan for Jason for over a month.

106. Even though Defendant Taraseviciute was Jason's assigned mental health provider, she did not see Jason until two weeks after his admission at JTC. Even then, she met with him for only 10 minutes. She did not provide any meaningful mental health treatment during that brief time and still had not conducted a complete mental health evaluation.

**C. Medical and mental health staff ignored Jason's need for a blood transfusion and warnings that he would self-harm.**

107. Four days after Jason arrived at JTC, Jason complained of stabbing pain related to his sickle cell anemia. The only treatment that could effectively relieve Jason's pain was a blood transfusion. Blood transfusions had been successful for him in the past, and had been recommended by numerous medical providers, including providers within IDOC.

108. In response to Jason's complaints of severe pain, Jason was sent by ambulance from JTC to the local hospital, St. Joseph's. However, St. Joseph's was not equipped to provide the blood transfusions that Jason needed, and Jason was transferred back to JTC without one.

109. Defendant Henze was the Medical Director of JTC and the only doctor on staff there. She was aware that the local hospital had not provided Jason with a blood transfusion, acknowledging in Jason's medical record that "he would have been better off" with the transfusion.

Nevertheless, she did not ensure that Jason was taken to a facility that could perform the transfusion.

110. On June 7, 2024, Jason told a nurse at the facility that he would harm himself if he was not given a transfusion: "Okay, give me the meds and then I'm going to show y'all. I'm going to paint the town red. I told y'all I need blood."

111. Defendant Martin saw Jason that day but was not concerned with understanding Jason's mental health needs, which were obviously severe. Their interaction lasted only 15 minutes, and Defendant Martin's notes were nearly identical to those from the diagnostic evaluation weeks earlier. (Defendant Martin would again copy these notes in his appointment with Jason two weeks later.)

112. Defendant Kucera, the Mental Health Authority at JTC, was informed of Jason's June 7 statement to the nurse. As the Mental Health Authority at JTC, Defendant Kucera was the facility's psychology administrator and was designated by the JTC warden to make mental health decisions. Defendant Kucera also was responsible for reviewing major occurrences related to mental health and developing plans to improve the provision of mental health care at JTC.

113. Despite Defendant Kucera's responsibility to ensure Jason's safety and knowledge of the problematic mental health practices at JTC, he did nothing to ensure that Jason was seen by a doctor or outside facility, continuously watched, or that his cell was checked for dangerous items with which he could harm himself.

**D. Jason harmed himself multiple times and still did not receive meaningful treatment.**

114. Later on June 7, after Defendants Martin and Kucera did nothing to protect Jason from the obvious risk that he would hurt himself, Jason ingested a piece of glass and was sent to St. Joseph's hospital, where he remained until June 11.

115. St. Joseph's advised prison staff that Jason should be taken to the University of Illinois Chicago (UIC) to obtain the blood transfusion he needed.

116. Defendant Funk, Wexford's Regional Medical Director, was informed of this incident and the hospital's recommendation. As Regional Medical Director, Defendant Funk had the ability and responsibility to ensure that Jason received the necessary offsite care at an appropriate medical facility. He knew Jason needed to be transferred to UIC or another facility that could provide a blood transfusion but did nothing to ensure that Jason promptly received this necessary treatment.

117. Defendant Gama was JTC's Mental Health Unit Director and was responsible for providing mental health care to patients incarcerated at JTC and for implementing, overseeing, and supervising policies and practices relating to the provision of mental health care at JTC. He too was aware of Jason's hospitalization due to self-harm and did nothing to ensure that Jason received adequate mental health care or to coordinate with Jason's medical providers regarding his need for a blood transfusion.

118. Upon information and belief, Defendants Henze, Anooshah, Martin, and Taraseviciute also were informed of Jason's self-harm and the hospital's recommendation that Jason be taken to UIC for a transfusion. Nevertheless, Defendants Henze, Anooshah, Martin, and Taraseviciute did nothing to ensure that Jason promptly received this necessary treatment.

119. When Jason talked to nurse practitioner Defendant Anooshah about his need to go to UIC, Defendant Anooshah merely explained that "referrals are placed through Wexford." Defendant Anooshah did nothing to ensure that a referral had been made or that a referral was timely completed.

120. Jason should have received additional mental health treatment upon return to JTC, but instead he was placed on crisis watch. Crisis watch completely isolated Jason from all other prisoners, severely restricted his movement, and prevented him from accessing certain mental health treatment, such as group therapy, that Jason found valuable.

121. On June 13, 2024, Defendant Taraseviciute had a short session with Jason and consulted about Jason's care with Defendant Gama. Jason stated, "I am in a lot of pain and I need a blood transfusion but they won't send me to the hospital," and "I need some medical help."

122. Rather than advocating for Jason, who had been tirelessly requesting medical treatment to everyone he interacted with, Defendant Taraseviciute callously told him he should advocate for his medical needs with medical staff (i.e., not mental health staff).

123. Despite their knowledge that Jason might harm himself, Defendants Taraseviciute and Gama reduced the frequency with which Jason would be monitored, from continuous monitoring to monitoring every 15 minutes.

124. The next day, while still on crisis watch, Jason swallowed another foreign object. Jason was taken to see Defendant Anooshah. Jason warned that he would keep self-harming until he was sent to UIC. Defendant Anooshah still did nothing to ensure he received treatment at UIC or adequate mental health care for his escalating self-harm.

125. Despite numerous interactions with Jason in the following weeks, Defendant Taraseviciute never recommended any meaningful change in his treatment, contacted medical staff regarding his need for a transfusion, or otherwise did anything to prevent Jason from continuing his pattern of self-harm to get treatment.

126. Defendant Kucera was repeatedly notified about Jason's condition and complaints to mental health staff that he needed to be taken to UIC and took no action to ensure he received adequate care.

127. On June 24, 2024, Defendants Martin and Taraseviciute finally developed a treatment plan for Jason. The plan stated that Jason should see Defendants Martin and Taraseviciute for at least 15 minutes once per month and should attend two weekly one-hour long group sessions. This plan was wholly inadequate for the severity of Jason's mental health needs. Moreover, Jason never received the weekly group sessions that were a part of his treatment plan.

128. Unsurprisingly, Jason harmed himself again. On June 30, Jason swallowed a fishhook. Again, he was taken to St. Joseph's, and referred to UIC for a transfusion to treat his pain. Jason refused treatment for the swallowed fishhook at St. Joseph's because the hospital would not treat his sickle cell disease. What he needed was a blood transfusion.

**E. Jason languished on crisis watch and in restrictive housing.**

129. Upon his return to JTC, Jason was placed on continuous crisis watch, meaning that someone was supposed to watch him continuously for 24 hours a day.

130. Jason received a disciplinary ticket upon his return. Upon information and belief, he received the disciplinary ticket because he had self-harmed. Despite the obvious connection between the self-harm and his mental illness, Defendant Gama determined that his mental illness did not contribute to the disciplinary ticket and did not ensure that Jason received additional mental health care or the medical treatment he needed.

131. On or before July 1, 2024, prison staff stopped providing Jason with his pain medications. Jason pleaded for his medications and a blood transfusion. Defendant Gama was directly notified of Jason's complaints but took no action to help him.

132. On July 10 and July 12, Jason reported to Defendant Henze that he was in a sickle cell crisis. She noted in Jason's medical records that the referral to UIC had been made but the appointment still had not been scheduled. Defendant Henze did nothing to ensure the appointment would be promptly scheduled. In fact, Jason did not see another medical provider of any kind for two weeks and never saw Defendant Henze or a medical doctor at JTC again.

133. On July 17, Jason met with a psychologist and reported that his medical condition had not changed. After the psychologist consulted with Defendant Gama, Jason was discharged from crisis watch into restrictive housing. Restrictive housing was even worse for Jason's mental health than crisis watch. Not only was he still unable to participate in the group therapy that was part of his treatment plan, but he did not receive the frequent (albeit brief and deficient) interactions with mental health staff that he had received on crisis watch.

134. Over the next 10 days, no mental health provider interacted with Jason.

### F. Jason was placed on "medical watch" for his extreme pain but received no additional care.

135. On July 26, 2024, Jason reported to Defendant Anooshah that he was having "pain all over" and thought he was experiencing a sickle cell crisis. Defendant Anooshah noted that Jason's tongue was covered in an orange film and placed him on "medical watch" until July 29. His only documented plan was to follow up three days later.

136. At JTC, a patient on medical watch does not receive heightened medical care or observation. Instead, Jason was simply housed separately from the general population in the segregation wing of the prison, which is far from the prison's health care unit. Upon information and belief, there was no doctor scheduled to see Jason while he was on medical watch.

137. Defendant Anooshah knew of Jason's history of self-harming behaviors when he was experiencing intense physical pain. Nevertheless, Defendant Anooshah did nothing to ensure that Jason saw a doctor, a mental health provider, or that he received increased observation.

138. Jason received no medical care after his interaction with Defendant Anooshah. He was left to suffer alone in his cell. And despite prison staff's knowledge that Jason had a history of harming himself when he was experiencing acute pain, he was left unwatched with no correctional staff on his wing.

139. It was then, after weeks of utter neglect from the mental health and medical providers—including Defendants Henze, Anooshah, Funk, Gama, Martin, Kucera, and Taraseviciute—that Jason made the desperate decision to light his mattress on fire in a cry for help.

**COUNT I**
**42 U.S.C. § 1983 – Deliberate Indifference (Eighth Amendment)**
**All Individual Defendants**

140. Each of the Paragraphs of this Complaint is incorporated herein.

141. In the manner described more fully above, Defendants Brodie, Dixon, Ervy, Gills, Dodd, Harvell, Hines, Obadein, Sumerlin, Velazquez, Williams, Henze, Anooshah, Funk, Gama, Martin, Kucera, Taraseviciute, Clark, Obazee, Adeyemi, and Onomah-Gaisie were aware that Jason Stephens faced a substantial risk of serious harm.

142. Specifically, Defendants Brodie, Dixon, Ervy, Gills, Dodd, Harvell, Hines, Obadein, Sumerlin, Velazquez, Williams, Clark, Obazee, Adeyemi, and Onomah-Gaisie were aware that there was a fire, or had recently been a fire, in Jason's cell, and he required medical treatment. Defendants Henze, Anooshah, Funk, Gama, Martin, Kucera, and Taraseviciute, were aware that Jason Stephens had sickle cell anemia and serious mental illnesses that required medical treatment, including mental health treatment.

143. Despite their respective knowledge, Defendants Brodie, Dixon, Ervy, Gills, Dodd, Harvell, Hines, Obadein, Sumerlin, Velazquez, Williams, Henze, Anooshah, Funk, Gama, Martin, Kucera, Taraseviciute, Clark, Obazee, Adeyemi, and Onomah-Gaisie failed to protect Jason from the fire and/or to provide him with proper medical care or access to medical care.

144. In the manner described more fully above, Defendants Hammers, Larry, Benson, Woods, and Oliver were all aware of the safety hazard of fires at JTC and the substantial risk of serious harm they posed to all individuals incarcerated there.

145. Despite that knowledge, Defendants Hammers, Larry, Benson, Woods, and Oliver failed to take steps to improve fire safety, such as by ensuring that fire safety equipment was available and functioning properly, training, supervising, and disciplining IDOC and Wexford employees regarding fire safety.

146. In the manner described more fully above, Defendants Bowman and Hinton were aware that there existed a widespread practice in IDOC by which medical and mental health treatment was not coordinated to facilitate patient care, and that such failure to coordinate posed a substantial risk of serious harm to all individuals incarcerated there.

147. Despite that knowledge, Defendants Bowman and Hinton failed to take steps to improve the medical and mental health treatment offered at IDOC facilities to ensure that patients like Jason received constitutionally adequate care.

148. Each Individual Defendant was deliberately indifferent to the objectively serious needs of Jason or prisoners similarly situated to Jason, and their actions were undertaken intentionally, with malice, and/or reckless indifference to Jason's rights.

149. The actions of each Individual Defendant were a proximate cause of Jason's death.

150. As a result of each Individual Defendant's unjustified and unconstitutional conduct, Jason experienced injuries, including but not limited to pain, suffering, emotional distress, and death.

**COUNT II**
**42 U.S.C. § 1983 – Excessive Force (Eighth Amendment)**
**Defendant Hines**

151. Each of the Paragraphs of this Complaint is incorporated herein.

152. In the manner described more fully above, Defendant Hines used excessive force against Jason Stephens. That use of force was unreasonable in light of the facts and circumstances present at the time that the force was used.

153. In using force against Jason, Defendant Hines intentionally used extreme or excessive cruelty toward him for the very purpose of causing him harm, and not in a good faith effort to maintain or restore security or discipline.

154. Alternatively, Defendant Hines knew that using force presented a risk of harm to Jason, but he recklessly disregarded that risk and Jason's safety by failing to take reasonable measures to minimize that risk of harm.

155. As a direct and proximate result of Defendant Hines's misconduct, Jason's rights were violated and he experienced injuries, including but not limited to pain, suffering, emotional distress, and death.

**COUNT III**
**42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)**
**All Individual Defendants**

156. Each of the Paragraphs of this Complaint is incorporated herein.

157. In the manner more fully described above, the Individual Defendants had a reasonable opportunity to prevent the violation of Jason's constitutional rights as set forth above had they been so inclined, but they failed to do so.

158. Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Jason's rights.

159. As a direct and proximate result of the Individual Defendants' misconduct, Jason's rights were violated and he suffered injuries, including but not limited to emotional distress and death.

**COUNT IV**
**42 U.S.C. § 1983 – *Monell* Claim (Eighth Amendment)**
**Defendant Wexford**

160. Each of the Paragraphs of this Complaint is incorporated herein.

161. At all times relevant to the events at issue in this case, Defendant Wexford contracted with IDOC to provide healthcare to people, including Jason, who were incarcerated in IDOC prisons, including JTC, Pontiac, and Lawrence. As the provider of healthcare services, Wexford was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of care to prisoners in IDOC custody.

162. Prior to the events giving rise to Plaintiff's Complaint, Defendant Wexford had notice of widespread policies and practices by healthcare staff pursuant to which prisoners with serious medical and mental health needs, like Jason, were routinely denied access to medical care, including mental health care.

163. It was common within IDOC to see prisoners with clear symptoms of serious medical needs, including severe mental illness, whose treatment was grossly inadequate, delayed, or completely ignored by healthcare employees. Despite knowledge of these problematic policies and practices, Defendant Wexford did nothing to ensure that prisoners in IDOC received adequate medical care and access to medical care, including mental health care, thereby acting with deliberate indifference.

164. Specifically, at all relevant times there existed policies or widespread practices in IDOC pursuant to which prisoners received unconstitutionally inadequate healthcare, including but not limited to policies and practices pursuant to which: (1) healthcare staff failed to adequately examine or diagnose prisoners in their care; (2) healthcare staff failed to create a sensible treatment plan for prisoners whose medical and mental health status clearly require the creation of a treatment plan; (3) healthcare staff failed or refused to provide for prisoners to be treated in outside facilities, even when an outside referral was necessary or proper; (4) healthcare staff failed to communicate with correctional staff, even when such communication was obviously necessary to protect the health and safety of prisoners; (5) healthcare staff failed to respond or follow up on complaints by prisoners about their health status; (6) healthcare staff failed to provide meaningful healthcare while prisoners were on crisis watch; (7) healthcare staff failed to provide meaningful mental health care while prisoners were housed in the health care unit; (8) healthcare staff failed to appropriately or timely transfer prisoners to higher levels of care; (9) healthcare staff failed to obtain or review records regarding diagnoses and treatment provided by mental health professionals prior to admission to IDOC; (10) there were inadequate numbers of medical professionals such that the necessary medical professional was always available to provide necessary services; and (11) prisoners on crisis watch were denied the ability to participate in programs available to other prisoners, such as telephone calls, commissary, out of cell time, education, jobs, and congregate meals.

165. These widespread policies and practices were allowed to flourish because Defendant Wexford, which directs the provision of healthcare services within IDOC, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and

discipline prior instances of similar misconduct. In this way, Defendant Wexford violated Jason's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

166. Jason's injuries, including but not limited to pain and suffering, emotional distress, and death were proximately caused by policies and practices of Defendant Wexford.

167. The above-described practices, so well-settled as to constitute de facto policy within IDOC, were able to exist and thrive because Defendant Wexford was deliberately indifferent to the problem, thereby effectively ratifying it.

168. Jason's injuries were caused by employees of IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described above.

**COUNT V**
**42 U.S.C. § 12101 – Americans with Disabilities Act**
**Defendants IDOC and Wexford**

169. Each of the Paragraphs of this Complaint is incorporated herein.

170. IDOC is a public entity as defined in 42 U.S.C. § 12131(1).

171. As a private entity which contracts with IDOC to provide medical care to Illinois prisoners, Wexford stands in the shoes of IDOC and is thus also a public entity as defined in 42 U.S.C. § 12131(1) and 49 C.F.R. § 37.23.

172. Jason had a combination of mental and physical illnesses which, either together or separately, rendered him disabled.

173. Jason's mental illness, as diagnosed by various IDOC and Wexford agents at various times, included depression, major depressive disorder with psychotic features, borderline personality disorder, post-traumatic stress disorder, and anti-social personality disorder.

174. Jason also suffered from the physical illness of sickle cell anemia, which frequently caused pain so severe that he was unable to engage in the ordinary activities of daily living.

175. Jason's mental health disorders and his sickle cell anemia were disabilities within the meaning of the Americans with Disabilities Act. He was otherwise qualified to participate in programs, services, or benefits offered by IDOC and Wexford, including but not limited to access to mental health services, out of cell programming such as group therapy, educational and job opportunities, yard, congregate meals, and telephone calls with family.

176. IDOC and Wexford were each aware of Jason's disability.

177. Under Title II of the ADA and 28 C.F.R. § 35.130(a), IDOC and Wexford are responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

178. Under Title II of the ADA and 28 CFR § 35.152(b), IDOC and Wexford were required to house prisoners with disabilities in the most integrated setting appropriate to their needs.

179. Despite this requirement, IDOC and Wexford housed Jason in extremely restrictive and isolated settings akin to solitary confinement because of his disabling medical and mental health conditions.

180. Despite Jason's known and obvious disability, IDOC and Wexford failed to reasonably accommodate his disability and discriminated against him, as described herein.

181. Specifically, and without limitation, IDOC and Wexford refused to allow Jason to participate in programming available to other prisoners for which he was otherwise qualified while

he was on crisis watch, housed in the health care unit, or on medical watch, such as group therapy, telephone calls, commissary, out of cell time (including yard time), education, jobs, and congregate meals.

182. Jason requested an accommodation for his disability, and the need for one was obvious, but IDOC failed to provide a reasonable accommodation.

183. Accordingly, IDOC's and Wexford's conduct violated Title II of the Americans with Disabilities Act.

184. As a result of IDOC's and Wexford's conduct, Jason suffered injuries, including pain, suffering, and death.

**COUNT VI**
**29 U.S.C. § 701 – Rehabilitation Act**
**Defendants IDOC and Wexford**

185. Each of the Paragraphs of this Complaint is incorporated herein.

186. IDOC is a public entity as defined in 42 U.S.C. § 12131(1).

187. As a private entity which contracts with IDOC to provide medical care to Illinois prisoners, Wexford stands in the shoes of IDOC and is thus also a public entity as defined in 42 U.S.C. § 12131(1) and 49 C.F.R. § 37.23.

188. IDOC and Wexford provided programs which received federal funding as defined in Section 504 of the Rehabilitation Act.

189. Jason had a combination of mental and physical illnesses which, either together or separately, rendered him disabled.

190. Jason's mental illness, as diagnosed by various IDOC and Wexford agents at various times, included depression, major depressive disorder with psychotic features, borderline personality disorder, post-traumatic stress disorder, and anti-social personality disorder.

191. Jason also suffered from the physical illness of sickle cell anemia, which frequently caused pain so severe that he was unable to engage in the ordinary activities of daily living.

192. Jason's mental health disorders and his sickle cell anemia were disabilities within the meaning of the Rehabilitation Act. He was otherwise qualified to participate in programs, services, or benefits offered by IDOC and Wexford, including but not limited to access to mental health services, out of cell programming such as group therapy, educational and job opportunities, yard, congregate meals, and telephone calls with family.

193. IDOC and Wexford were each aware of Jason's disability.

194. Under the Rehabilitation Act, IDOC and Wexford are responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

195. Despite Jason's known and obvious disability, IDOC and Wexford failed to reasonably accommodate his disability and discriminated against him, as described herein.

196. Specifically, and without limitation, IDOC and Wexford refused to allow Jason to participate in programming available to other prisoners for which he was otherwise qualified while he was on crisis watch, housed in the health care unit, or on medical watch, such as group therapy, telephone calls, commissary, out of cell time, education, jobs, and congregate meals.

197. Jason requested accommodation for his disability, and the need for one was obvious, but IDOC failed to provide a reasonable accommodation.

198. Accordingly, IDOC's and Wexford's conduct violated the Rehabilitation Act.

199. As a result of the IDOC's and Wexford's conduct, Jason suffered injuries, including pain, suffering, and death.

**COUNT VII – State Law Claim**
**740 ILCS 180/1 – Wrongful Death**
**Defendants Wexford, Funk, Henze, Anooshah, Kucera, Gama, Martin, and Taraseviciute**

200. Each of the Paragraphs of this Complaint is incorporated herein.

201. In the manner more fully described above, the actions of the Defendants Wexford, Funk, Henze, Anooshah, Kucera, Gama, Martin, and Taraseviciute breached the duty of care owed to prisoners in their custody.

202. Alternatively, the actions of the Defendants Wexford, Funk, Henze, Anooshah, Kucera, Gama, Martin, and Taraseviciute were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

203. The actions of Defendants Wexford, Funk, Henze, Anooshah, Kucera, Gama, Martin, and Taraseviciute were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

204. As a direct and proximate result of the negligence and/or willful and wanton conduct of Defendants Wexford, Funk, Henze, Anooshah, Kucera, Gama, Martin, and Taraseviciute , Jason suffered injuries, including death and great pain and suffering.

205. Plaintiff Benjamin Topp, on behalf of all legally recognized family members, claims damages for the wrongful death of Jason, and for the loss of his services, protection, care, future income, assistance, society, companionship, comfort, guidance, counsel and advice, and for

the mental anguish caused by this loss, as well as for funeral expenses pursuant to 740 ILCS § 180/1, commonly referred to as the Illinois Wrongful Death Act.

**COUNT VIII – State Law Claim**
**755 ILCS 5/27-6 – Survival Action**
**Defendants Wexford, Funk, Henze, Anooshah, Kucera, Gama, Martin, and Taraseviciute**

206. Each of the Paragraphs of this Complaint is incorporated herein.

207. In the manner more fully described above, the actions of the Defendants Wexford, Funk, Henze, Anooshah, Kucera, Gama, Martin, and Taraseviciute breached the duty of care owed to prisoners in their custody.

208. Alternatively, the actions of Defendants Wexford, Funk, Henze, Anooshah, Kucera, Gama, Martin, and Taraseviciute were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants Wexford, Funk, Henze, Anooshah, Kucera, Gama, Martin, and Taraseviciute were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

209. The actions of Defendants Wexford, Funk, Henze, Anooshah, Kucera, Gama, Martin, Taraseviciute, and John Does #6-9 were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

210. As a direct and proximate result of the negligence and/or willful and wanton conduct of Defendants Wexford, Funk, Henze, Anooshah, Kucera, Gama, Martin, and Taraseviciute Jason suffered great conscious pain and suffering prior to his death.

211. Jason filed no action during his lifetime, but under the law of the State of Illinois, this action survives and may be asserted by his Estate.

212. Plaintiff Benjamin Topp, on behalf of the Estate of Jason Stephens, claims damages for the conscious pain and suffering of Jason, pursuant to 755 ILCS § 5/27-6, commonly referred to as the Illinois Survival Act.

**COUNT IX**
**Respondeat Superior**
**Defendant Wexford**

213. Each of the Paragraphs of this Complaint is incorporated herein.

214. In committing the acts alleged in the preceding paragraphs, Defendants Funk, Henze, Anooshah, Kucera, Gama, Martin, and Taraseviciute, and many of the other healthcare staff who provided inadequate care to Jason, were employees, and members, and agents of Wexford, acting at all relevant times within the scope of their employment.

215. Consequently, Defendant Wexford is liable for their actions under state law.

216. Defendant Wexford, as a private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employees acting within the scope of their employment. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793-95 (7th Cir. 2014).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Benjamin Topp, as Administrator of the Estate of Jason Stephens, hereby respectfully requests that this Court enter a judgment in his favor and against Illinois Department of Corrections, Wexford Health Sources, Inc., Steven Bowman, Melvin Hinton, Catherine Larry, Gary Benson, Ryan Woods, Devon Brodie, Brianna Dixon, Reymund Ervy, Sunshine Gills, Breonda Harvell, Timothy Hines, Abayomi Obadein, Brianna Sumerlin, Miguel Velazquez, Sophia Williams, Nathaniel Oliver, Montisia Clark, Astonta Dodd, Justin Hammers, Arthur Funk, Marlene Henze, Alexander Anooshah, Dianna Kucera, Andrew Gama, J.G. Martin, Greta Taraseviciute, Jennifer Obazee, Ayodeji Adeyemi, and Alex Onomah-Gaise, awarding

compensatory damages, punitive damages, pre- and post-judgment interest, attorney fees and costs, and any other relief that this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff Benjamin Topp hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated: July 24, 2026

Respectfully submitted,

/s/ *Terah Tollner*
Terah Tollner
Attorney for Plaintiff

Sarah Grady
Jed Glickstein
Vanessa del Valle
Alan Mills
Annie Prossnitz
Terah Tollner
Mattie Haag
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, Illinois 60614
(312) 852-2184
terah@kaplangrady.com